**In re PRIME MOTOR INNS, INC.,
et al., Debtors.**

**In re SERVICO, INC., et al., Debtors.**

**PRIME MOTOR INNS, INC., and
Prime Management Co.,
Inc., Plaintiffs,**

**v.**

**FIRST FIDELITY BANK N.A. NEW
JERSEY and Manufacturers
Hanover Trust Company, Defendants.**

**Bankruptcy No. 90–16604–BKC–AJC.
Adv. No. 90–0504–BKC–AJC–A.**

United States Bankruptcy Court,
S.D. Florida.

Oct. 18, 1990.

William J. Rochelle, III, Courtney Slaten Katzenstein, David Rosenzweig, Fulbright, Jaworski & Reavis McGrath, New York City, for Prime Motor Inns, Inc.

Dennis O'Grady, Riker, Danzig, Scherer & Hyland, Morristown, N.J., David M. Levine, McDermott, Will & Emery, Miami, Fla., for First Fidelity as Indenture Trustee.

Brian Gart, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, PA, Miami, Fla., for First Fidelity Bank as Letter of Credit Issuer.

Robert Soriano, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, PA, Tampa, Fla., for Mfrs. Hanover Trust Co. as Letter of Credit Issuer.

Holland and Knight, Miami, Fla., Chapman and Cutler, Chicago, Ill., for Smith, Barney Harris Upham and Co., Inc.

## MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION

A. JAY CRISTOL, Bankruptcy Judge.

### I.

*Background*

#### A. The Prime Bankruptcy

On September 18, 1990, Prime Motor Inns, Inc. ("Prime") and fifty (50) of its direct and indirect subsidiaries, including Prime Management Co., Inc. ("Prime Management") (collectively, the "Prime Debtors") filed petitions for reorganization relief under chapter 11 of title 11, United States Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Prime Debtors continue to operate their businesses and manage their properties as debtors in possession. At the commencement of the Prime Debtors' chapter 11 cases, this Court entered an order authorizing the joint administration for procedural purposes of the Prime Debtors' cases with the cases of the debtor Servico, Inc. and its debtor subsidiaries and affiliates.

#### B. The Industrial Development Bonds

The Prime Debtors are a large and complex business engaged primarily in the ownership, management, operation, development and franchising of full and limited service hotels located throughout the United States. The Prime Debtors own, lease, or manage an aggregate of approximately 135 hotels and employ approximately 8000 people.

Prime and Prime Management have financed the cost of constructing six hotels by the issuance of tax exempt industrial revenue bonds through the New Jersey Economic Development Authority (the "Authority"). The industrial revenue bonds are secured by letters of credit (the "Letters of Credit") issued by various banks (the "LC Issuers") to the indenture trustee of the Bonds. Prime and Prime Management guaranteed payment of each other's indebtedness under the Bonds.

The bonds which are the subject of this adversary proceeding were in the original principal amount of approximately $18 million. The testimony indicates that the presently outstanding principal amount is approximately $13.8 million. The bonds (the "Bonds") consist of the following Bonds issued by the Authority: Adjustable Rate Economic Development Bonds, Prime Motor Inns, Inc.—Rochelle Park 1982 Series; Adjustable Rate Economic Development Bonds, Prime Motor Inns, Inc.—East Hanover 1982 Series; Adjustable Rate Economic Development Bonds, Prime Motor Inns, Inc.—Clifton 1982 Series; Economic Development Bonds—Prime Motor Inns, Inc.—1983 Fairfield Project; and Adjustable Rate Economic Development Bonds, Prime Motor Inns, Inc.—1984 East Hanover Project. This adversary proceeding also involves Adjustable Rate 7–Day Demand Industrial Revenue Bonds—1984 Kingston Project issued by the Ulster County (New York) Development Agency (the "Agency").

First Fidelity Bank N.A. New Jersey ("First Fidelity" or the "Indenture Trustee") is indenture trustee under the relevant trust indentures (the "Indentures") between the Authority or the Agency, as the case may be, and First National State Bank (now known as First Fidelity) pursuant to which the Bonds were issued. First Fidelity and Manufacturers Hanover Trust Company ("MHT") issued the Letters of Credit to secure the debt due under the Bonds.

The Bonds can be separated into three groups. In the first group, First Fidelity is Indenture Trustee and also is LC Issuer. The Bonds in that group are: The Rochelle Park 1982 Series, The East Hanover 1982 Series, and the 1982 Clifton Project (together, the "Rochelle Park Bonds"). The second group consists of Bonds in which First Fidelity is Indenture Trustee and MHT is LC Issuer. The Bonds in that group are: The 1983 Fairfield Project and the 1984 East Hanover Project (the "Fairfield Bonds"). The third group of Bonds is the 1984 Kingston Ramada Project (the "Kingston Bonds") in which First Fidelity is Indenture Trustee and MHT is LC Issuer.

The rate of interest on the Bonds ranges from 6% to 8.5% depending upon the issue.

As stated above, each Bond issue is secured by Letters of Credit in amounts equal to or greater than the principal amount of the Bond issue. Prime and Prime Management, as the case may be, are parties to reimbursement agreements with the LC Issuers which provide for interest rates of 2% over the prime rate of interest of the LC Issuers upon a draw of the Letters of Credit. Any payments by the LC Issuers are secured by mortgage liens on the underlying properties.

Upon a draw of the Letter of Credit, "new" loan terms between Prime or Prime Management and the LC Issuer are triggered at the significantly higher interest rate. With the prime rate of interest now standing at 10%, interest would accrue at the rate of 12%. After the Letters of Credit are drawn by the Indenture Trustee, the difference in interest rates amounts to roughly $742,000 per year in additional interest owed by Prime and Prime Management. Depending upon the issue, the Bonds mature between 1997 and 2009. If the Letters of Credit are drawn and the Bonds repaid, the aggregate additional interest expense to Prime and Prime Management is very substantial. The testimony indicates that such a substantial increase in interest adversely affects the economics of the properties and diminishes the value of the investments of Prime and Prime Management.

C. The Notices of Acceleration and Bankruptcy Filing

Pursuant to certain Notices of Acceleration and Demand for Payment (the "Acceleration Notices") dated September 25, 1990, First Fidelity, as Indenture Trustee, served notice to Prime, Prime Management and the holders of the Bonds (the "Bondholders") of purported defaults and the alleged acceleration of the debt due under the Bonds and demanded payment from both the obligors and the guarantors of the

debt.[1] First Fidelity also served Notices of Prime Motor Inns, Inc. Bankruptcy Filing (the "Bankruptcy Notices") announcing, among other things, First Fidelity's intention to draw upon the Letters of Credit and to redeem or purchase the Bonds. First Fidelity sought no modification of the automatic stay under 11 U.S.C. § 362(a) and alleged no purported default by Prime or Prime Management other than the filing of these chapter 11 cases.

Each Indenture essentially provided that Prime or Prime Management's bankruptcy filing, as the case may be, constituted an event of default under the Indenture. For the Rochelle Park Bonds, § 601(e) of the Indenture provides that there is an event of default "if there shall occur an 'Event of Default' under ... § 8.1(c) of the Loan Agreement [between the Authority and Prime or Prime Management]," which in turn provides that the filing of a bankruptcy petition by Prime or Prime Management is an event of default. With respect to the Fairfield Bonds, § 601(e) of the Indenture provides that an "Act of Bankruptcy" by Prime or Prime Management constitutes an event of default. Finally, with respect to the Kingston Bonds, § 8.10(c) of the Indenture provides that a default under a lease between the Agency and Prime or Prime Management, including the default of bankruptcy, constitutes an event of default under the Indenture.

As a result, the Indenture Trustee presented the necessary sight drafts and has drawn on the Letters of Credit securing the Bonds. First Fidelity and MHT, as LC Issuers, paid the Indenture Trustee pursuant to the draws upon the Letters of Credit. The Indenture Trustee, in turn, intended to pay the Bondholders pursuant to the terms of the Indentures.

The filing of chapter 11 petitions by Prime and Prime Management are the only "defaults" alleged by the Indenture Trustee. Similarly, the *ipso facto* bankruptcy default provisions in the Indentures are the only grounds relied upon by First Fidelity for the draw on the Letters of Credit. First Fidelity did not dispute the testimony

that there had never been any defaults whatsoever with respect to the Bonds. Interest payments on the Bonds were current when the debtors filed their chapter 11 petitions, and interest on the Bonds has been paid when due around October 1, 1990. The debtors indicated that the debtors intend to remain current on the payment of interest during the course of the chapter 11 cases.

D. The Adversary Proceeding

As a result, on or about October 1, 1990, Prime and Prime Management commenced an adversary proceeding against First Fidelity and MHT seeking, *inter alia*, an injunction preventing First Fidelity, as Indenture Trustee, from disbursing any funds received by it under the Letters of Credit to the Bondholders. Prime and Prime Management simultaneously moved for a preliminary injunction and temporary restraining order, *inter alia*, enjoining First Fidelity, as Indenture Trustee, from disbursing any funds received by it on account of the Bonds and under the Letters of Credit.

The United States District Court for the Southern District of Florida has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. § 1409. This adversary proceeding is automatically referred to this Court pursuant to 28 U.S.C. § 157. This adversary proceeding and the motion for a preliminary injunction are core proceedings under 28 U.S.C. § 157(b)(2)(A), (G), and (O).

On October 3, 1990, after telephonic hearing on October 1, 1990, the Court entered a temporary restraining order enjoining and restraining First Fidelity as Indenture Trustee from disbursing the funds received by it under the Letters of Credit to the Bondholders pending the hearing on the motion for a preliminary injunction which was scheduled for October 10, 1990. On October 10, 1990, the hearing on the motion for a preliminary injunction was continued to October 18, 1990, the Court

---

**1.** An Acceleration Notice was not served with respect to the Kingston Bonds.

took testimony, and the temporary restraining order was extended through that date.

## II.

### *The Facts and the Law with Regard to the Preliminary Injunction*

A preliminary injunction will be entered where (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) there is a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted, (3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may cause the defendant, and (4) the granting of the preliminary injunction will not disserve the public interest. *See, e.g., Johnson v. United States Department of Agriculture*, 734 F.2d 774, 781 (11th Cir.1984).

### A. Likelihood of Success on the Merits

Letters of credit are used as credit-enhancement devices and represent the issuing bank's irrevocable obligation to make payments thereby relieving the beneficiary—in this case the Bondholders—of the risk of nonpayment or nonperformance. *See* Affidavit of John C. McKenzie, at p. 3, submitted by Smith Barney, Harris Upham & Co., Inc. in opposition to the motion for a preliminary injunction. (the "McKenzie Affidavit").

■ Of significance, there has been no payment default under the Bonds by Prime or Prime Management. Payments pre-petition and post-petition have been made and continue to be made by Prime and Prime Management. First Fidelity did not contest the lack of any defaults other than the bankruptcy filings. Additionally, Prime and Prime Management have represented that they intend to continue making interest payments under the Bonds. Indeed, the McKenzie Affidavit explains that the purpose of the Letters of Credit is that "LC Issuer relieves the [bondholders] of the risk of nonpayment or nonperformance...." McKenzie Affidavit, at p. 3. Thus, the underlying purpose of the Letters of Credit—to remove the risk of nonpayment or nonperformance—has not become an issue and is not implicated in this case because there never has been a default.

The *only* "defaults" by Prime and Prime Management under the Indentures are the filing of petitions for reorganization relief under chapter 11 of the federal Bankruptcy Code. This is not a valid and operative default which would allow a draw upon the Letters of Credit.[2] In that connection, § 365(e)(1) prohibits the termination or modification (at any time after a debtor's bankruptcy case has been commenced) of a contract provision because of (a) the insolvency of financial condition of the debtor, (b) the commencement of a bankruptcy case, or (c) the appointment of a trustee.[3] Similarly, § 541(c) of the Bankruptcy Code prohibits the forfeiture of property of the estate conditioned merely upon the filing of a bankruptcy petition. Thus, the default provisions relied upon by the Indenture Trustee are unenforceable and invalid pursuant to the anti-*ipso facto* provisions of § 365(e)(1) and § 541(c) of the Bankruptcy Code.

In *In re Texaco Inc.*, 73 B.R. 960 (Bankr. S.D.N.Y.1987), the indenture trustee argued that the debtors' bankruptcy constituted an event of default under the inden-

---

**2.** Prime and Prime Management did not attempt to enjoin the LC Issuers from honoring the drafts presented on the Letters of Credit. Rather, the debtors have apparently taken the position that the Indenture Trustee was automatically enjoined under § 362(a) of the Bankruptcy Code from presenting the drafts in the first place. Thus, the authorities relied upon by the Indenture Trustee to the effect that Letters of Credit must be paid when draws are presented are not pertinent to this case.

**3.** Section 365(e)(1) provides in relevant part:

Notwithstanding a provision in an executory contract ... an executory contract ... of the debtor may not be terminated or modified, and any right or obligation under such contract ... may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract ... that is conditioned on—(A) the insolvency or financial condition of the debtor ...; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

ture which allowed the indenture trustee to accelerate the indebtedness. *Id.* at 962. The court in *Texaco* ruled that an indenture trustee could not accelerate the indebtedness "because [it] may not rely upon the debtors' commencement of their voluntary cases under the Bankruptcy Code as an 'Event of Default'.... This *ipso facto* clause may not modify the rights and obligations of [the debtors] under the Indenture." *Id.* at 965. The court ruled that the *ipso facto* clause in the indenture trust agreement "is expressly denounced and is unenforceable pursuant to 11 U.S.C. § 365(e)(1)(B)." *Id.* The court also ruled that the filing of a notice of acceleration of the indebtedness was proscribed by the automatic stay. *Id.* at 967. Therefore, First Fidelity, as Indenture Trustee, cannot rely upon Prime and Prime Management's bankruptcy as an event of default accelerating the indebtedness and triggering a draw upon the Letters of Credit.

▆▆▆▆ In response, First Fidelity claims that the *ipso facto* clauses in the Indentures are enforceable because the indebtedness accelerated was not an obligation embodied in an executory contract of Prime or Prime Management. This argument exalts form over substance. It is well settled that courts—particularly reorganization courts—will look to the substance of a transaction rather than its form. *See In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("As a court of equity, [a bankruptcy court] may look through form to the substance of a transaction...."). In this case, the form of the transaction was driven by tax considerations. For the Bonds to be tax-exempt, the State must be the issuer. Therefore, Prime or Prime Management could not, in a strictly technical sense, be the issuer of the Bonds.

In substance, however, Prime and Prime Management are the real issuers and are the beneficial issuers of the Bonds pursuant to the Indentures. In that regard, the Indenture Trustee did not dispute testimony to the effect that Prime and Prime Management are ultimately obligated to pay either the principal and interest on the Bonds or amounts (plus interest) drawn under the Letters of Credit. The Indenture Trustee also did not dispute the fact that the structure of the transaction was a function of tax laws, apart from which Prime and Prime Management would have been parties to the Indenture and the issuers of the Bonds. Even so, the role of the State of New Jersey was short-lived. The State issued the Bonds, received the loan proceeds, passed the proceeds to Prime and Prime Management and then stepped out of the picture. Thus, the Bond issues here are no different from any other bond issue, and the Court will look to this substance to prevent emasculation of the fundamental debtor protection of § 365(e)(1)(B) by the use of clever drafting techniques and complex forms of transactions.[4]

▆▆▆▆ In sum, the *ipso facto* clauses in the Indentures are of no force and effect. Therefore, there has been no event of default or acceleration of the indebtedness that could trigger a draw upon the Letters of Credit. If there was no event of default and acceleration of the indebtedness, then draws upon the Letter of Credit were improper and the *status quo ante* should be restored by virtue of the Court's equitable powers under § 105(a) of the Bankruptcy Code. Thus, there is a substantial likelihood that Prime and Prime Management will succeed on the merits in this adversary proceeding.[5]

---

**4.** If the form of the transaction could be used to circumvent the protections afforded by § 365(e)(1) and § 541(c)(1), this and other fundamental protections contained throughout the Bankruptcy Code, such as the automatic stay of § 362(a), could be circumvented easily.

**5.** The Indenture Trustee found itself in an uncomfortable position believing it had no choice but to follow the terms of the Indenture. The Court believes that First Fidelity, as Indenture Trustee, carried out its fiduciary duties as di-

rected by the Indentures. However, carrying out its fiduciary responsibilities as compelled by the Indentures may have been in violation of the debtors' rights or in violation of the automatic stay of § 362(a). To avoid exposure for a possible violation of the automatic stay, the Court notes that the Indenture Trustee could have sought guidance from this Court by filing an emergency motion for relief from the automatic stay or for a declaration that the automatic stay did not apply to an acceleration of the

### B. Irreparable Injury

For several reasons, Prime and Prime Management will suffer irreparable injury if the proceeds of the Letters of Credit are distributed to the Bondholders. First, the adversary proceeding could be moot. There will be no ability to retrieve the funds from the many Bondholders. Second, Prime and Prime Management will have lost the right to reinstate the indebtedness to the Bondholders in a plan of reorganization under §§ 1123(a) and 1124(2). As stated by the court in *Texaco:*

> The giving of a Notice of Acceleration under the Indenture as a result of the commencement of the Chapter 11 cases would further muddy the waters should the debtors later seek to deaccelerate the indebtedness in accordance with 11 U.S.C. § 1124 and cure any defaults.

*In re Texaco Inc.*, 73 B.R. at 968. Third, Prime will be indebted to the LC Issuers—rather than the Bondholders—at a higher interest rate that will cost these estates approximately $742,000 annually in additional interest.

The higher interest rates and the loss of the § 1124 right to reinstate the indebtedness under the Bonds is critical to the decision in this case. The increased interest expense to Prime and Prime Management is akin to enforcement of a default rate of interest clause in a loan document after bankruptcy. Several legal reasons bar an increase in the rate of interest on pre-petition loans because of bankruptcy. In that connection, § 365(e), the anti-*ipso facto* provision of the Bankruptcy Code, prohibits the modification of a contract provision because of the commencement of a bankruptcy case. Further, under time-honored precedent, a default rate of interest cannot be imposed upon Prime and Prime Management after their bankruptcy filings. *See, e.g., Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986). Thus, to allow the draw upon the

Letters of Credit where there is no payment default under the Bonds is analogous to allowing enforcement of a default interest rate because of bankruptcy filings. This cannot be done.

■ Moreover, even where a default rate of interest is triggered by a default prior to bankruptcy, the debtor has the right to deaccelerate the indebtedness and reinstate the pre-default rate of interest. *See In re Southeast Co.*, 868 F.2d 335 (9th Cir.1989); *In re Entz–White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988); *In re Singer Island Hotel, Ltd.*, 95 B.R. 845 (Bankr.S.D. Fla.1989). Here, of course that right to reinstate the indebtedness to the Bondholders is lost as a result of the "new" loan terms with the LC Issuers at the higher rate of interest. Thus, the form of the transaction here would result in destruction of certain rights under the Bankruptcy Code and the imposition of higher interest rates after bankruptcy.

Balanced against this irreparable harm to Prime and Prime Management is essentially no harm to the Indenture Trustee and the Bondholders. In that regard, pending resolution of the adversary proceeding or further order of the Court, the funds will remain under the control of the Indenture Trustee. Based upon the outcome of the adversary proceeding, or interlocutory orders during the course of the adversary proceeding, the funds will flow either back to the LC Issuers or to the Bondholders. Also, there has been no payment default under the Bonds, and Prime and Prime Management have represented that they intend to make all payments to the Bondholders. Thus, there will be no harm to the Bondholders if the *status quo* is maintained during this adversary proceeding.

### C. Public Interest

The public interest will be served by granting a preliminary injunction and maintaining the *status quo*. Prime and Prime

---

Bonds and a drawing on the Letters of Credit. Although the Indenture Trustee may have carried out its responsibilities under the Indentures, this Court saves for determination at a

later time whether any damages have resulted from the actions of the Indenture Trustee and what parties (be it the Indenture Trustee or the Bondholders) should be responsible.

Management will not be saddled with additional interest costs and lose their rights under § 1124 before this adversary proceeding can be adjudicated. Without an injunction, the adversary proceeding could be rendered moot and this Court may never reach the merits. Finally, the sanctity of letters of credit will not be impaired. Their purpose is to remove the risk of *nonpayment* or *nonperformance*. That has not occurred. At this time it appears that Prime and Prime Management will continue to make payments under the Bonds.

### III.

### *Conclusion*

Prime and Prime Management have met the standard for the issuance of a preliminary injunction. There is a substantial likelihood that Prime and Prime Management will succeed on the merits; Prime and Prime Management will be irreparably harmed absent a preliminary injunction and the balance of harm tips in favor of Prime and Prime Management; and the public interest will not be disserved by the preliminary injunction. The Court will therefore exercise its equitable power under § 105(a) of the Bankruptcy Code and preliminarily enjoin the defendants.

The entirety of this memorandum opinion constitutes the findings of fact pursuant to Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 7065.

THEREFORE, IT IS ORDERED, ADJUDGED AND DETERMINED that pending disposition of this adversary proceeding the Indenture Trustee be, and it hereby is, preliminarily stayed, restrained and enjoined from disbursing to the Bondholders any funds received by it pursuant to the Letters of Credit securing such Bonds.

DONE and ORDERED.